### JAMES A. WRIGHT ET AL. v. EMMA M. REMINGTON.

1. A statute of the State of Illinois, which contains a provision that "contracts may be made and liabilities incurred by a wife, and the same enforced against her in the same manner as if she were unmarried," empowers a married woman in that state to sign a note as surety for her husband's debt.

2. Such contract is not so in conflict with the general interest of the body of the citizens of this state, or its public policy, as to afford a reason for a non-enforcement of the contract here.

3. A threat made by a husband, through procurement of one of the payees, that unless his wife signed such note he would poison himself, and which threat was made to induce and did induce her to sign, does not amount to duress, and is, in law, no defence to an action against her upon such note.

4. Parol declarations made by the payee of a note to the maker, endorser or guarantor thereof, at the time of the signing, to the effect that such maker, endorser or guarantor would not be called upon to pay the note, is not admissible in evidence, and is therefore no defence to such action.

The statement of the case shows that this cause involved the trial of two feigned issues framed to try the validity of two judgments entered upon notes, with warrant to confess judgment against the said Emma M. Remington. The said notes were signed by Emma M. and her husband, S. Remington, at Chicago, and were payable at the same place. They were made payable to the order of Kent & Keith, and were endorsed by them to the plaintiff after maturity. It appeared on the trial that Emma M. signed these notes as surety for her husband, S. Remington. To meet this, the plaintiff offered in evidence the public laws of 1861, of 1869, and the revised statutes of the year 1874, of the State of Illinois. Each contained acts relative to married women, the most important entitled "An act to revise the law in relation to husband and wife." *Rev.*, (*Ill.*) *p.* 576.

When the plaintiffs rested, a motion to non-suit was made, on the ground that the laws of Illinois were not sufficiently proved, and that it was not shown that there was no such law in Illinois as the fifth section of the New Jersey married woman's act. This motion was refused.

On the part of the defendant it was shown that, at the time of making the notes, Emma had been separated from her husband two or three months. It was proved that the husband, to induce his wife to sign, threatened self-destruction by taking poison unless she signed them. It was in evidence that

Kent, one of the payees, and his lawyer, Rockwell, solicited Mrs. Remington to sign the notes. She swore that Kent said to her that she would not be obliged to pay the notes. And that he said to her that "all he wanted was my name as security; he would let Mr. Remington pay them afterward; Mr. Rockwell said that if he were I he would sign the notes; I would not be obliged to pay them; Mr. Remington would pay them by work."

The charge to the jury was as follows:

"Another ground of defence is, that these notes were signed by her in consequence of threats, made by her husband, of self-destruction unless she executed them, and that, having been signed under that compulsion, she insists that she is not liable. This ground of defence resolves itself into two questions.

"*First.* If the threats were made by the procurement of Kent & Keith, or their agent, Rockwell, to bring about the execution of the notes, and if they were operative in getting her signature to the notes, it would amount to a legal defence to this action.

"*Second.* If the threats were made without the knowledge of Kent & Keith, or their agent, and were of such a character and made under such circumstances as might reasonably be expected to take from the defendant the power of choosing whether she would sign the notes or not, and she did, in fact, sign them in that state of mind, and would not have signed them at all but for such threats, you may, for the purposes of this case, consider that she cannot be held liable for the payment of the notes. The burden of showing this is upon Mrs. Remington."

In charging the jury about the third ground of defence, the court said: "There is another ground of defence, viz., that at the time of the execution of the notes, it was represented to Mrs. Remington, by Kent & Keith and their agent, Mr. Rockwell, that the signing was a mere matter of form, and she would not be held liable. If you believe that these representations were made, and that the defendant signed the notes on the faith of them, this is a good defence."

A verdict was returned for the defendant, Emma.

This is the part of the state of the case signed by the counsel of the respective parties, which is material. The cause was certified by the trial judge to this court for the advisory opinion of this court upon a motion for a new trial.

Argued at November Term, 1878, before BEASLEY, CHIEF JUSTICE, and Justices WOODHULL and REED.

For the plaintiff, *H. A. Drake.*

For the defendant, *R. S. Jenkins.*

The opinion of the court was delivered by

REED, J. The admission of the statutes of Illinois was entirely proper under the provisions of section twenty-two of our evidence act. *Rev., p.* 381. The last statute offered was relied upon by the plaintiffs to show the validity of the contract of married women in Illinois, the place of the making and performing the same. The sixth section of the said act —*Rev. (Ill.,)* 1874, *p.* 576—is as follows: "Contracts may be made and liabilities incurred by a wife, and the same enforced against her to the same extent and in the same manner as if she were unmarried, but, except with the consent of her husband, she may not enter into or carry on any partnership business, unless her husband has abandoned or deserted her, or is an idiot, or insane, or is confined in the penitentiary."

The proviso contained in the fifth section of our married woman's act is absent from the Illinois statute, and there appears in the latter no restriction upon the contractual ability of the married woman to become endorser, surety or guarantor. Subject to the exceptional instances of her engaging in partnership business, she is as unrestricted as a *feme sole.* There can, therefore, be no question but that the contract was valid by the law of Illinois.

It is, therefore, the duty of the courts of this state to recognize and enforce it, unless it appears injurious to the interests of the state or of our citizens. But nothing approaching

this result can be deduced solely from the fact that the foreign statute confers upon a married woman the power to make a contract of suretyship.

That it would have been an act of legislative wisdom to have incorporated into the Illinois act a provision similar to that in our own and the New York state married woman's act, by which the married woman is restrained from assuming a liability as surety, I think the testimony in this case demonstrates. But whatever may be our opinion of the policy of legislation beyond our state, we are bound by the principles of comity to recognize its validity, unless it clearly contravenes the principles of public morality or attacks the interest of the body of the citizens of our state. This does neither, and there is no force in the objection taken upon this ground.

The next ground of contention by the defence at the trial was relative to the effect of the acts of the husband, and also of one of the payees and his attorney toward the married woman before and at the time of signing these notes.

The court charged the jury, substantially, that if threats were made by the husband, through the procurement of the payees or their agent, that he, the husband, would kill himself unless she signed, and the threats were made for the purpose of inducing, and did induce, her to sign the notes, then the woman was not liable upon the notes. The court also charged that even if the threats were made without the knowledge of the payees, and were of such a character as to deprive her of the power to choose whether she would or would not sign, &c., then she was not liable. Both of the above instructions were given obviously upon the assumption that the facts upon the existence of which they were predicated, showed such a coercion of the will of the woman as to deprive her of the power of volition, and so the contract was stripped of an essential element, namely, the assent of both parties to its terms.

The common law, however, very early guarded the stability of contracts by a rule which required the exercise of a much higher degree of coercive force than here appears, before the

question of want of the power of consent could be entertained as a question of fact. The degree of restraint or terror to which the party must be subjected, as a ground for avoiding his contract, must rise to what the law recognized as duress, and the statement of the grounds of such avoidance appears in the earliest books of authority. *Bac. Abr.*, "*Duress.*"

These grounds were stated in the case of *Sooy* ads. *State*, 9 *Vroom* 329, and a repetition of them here would be profitless. The language in the opinion in that case, although used in reference to the avoidance of a bond, is applicable to the avoidance of any contract, sealed or unsealed.

In turning from the statement of what is essential to constitute a defence upon the ground of duress, to the facts in this case, it at once appears that they do not make a case within the rule laid down relative to such defence. There was no imprisonment of the woman or threat of imprisonment. There was no threatened injury to her person.

The influence was, that her husband threatened not to injure her, but to kill himself. It is true that there is the statement in the books that duress to a wife will avoid a deed made by the husband under that influence. *Bac. Abr.*, "*Duress*," *B*.

It may be that had the payees of the note or their agent threatened to take the life of the husband unless the wife signed the note, and she signed under the influence of the terror excited by such threats, it would have avoided the contract. But here the threats were made by the husband against his own life. The maker and the object of the threats were the same. Their execution was within his own power of volition. The wife knew that no harm could come to him except by his own act. The present case is utterly unlike an instance of the presence of some overshadowing danger, uncontrollable by either the wife or the person endangered.

There is no trace of a doctrine that the threat of a husband against himself will avoid the contract of his wife, or conversely, and such a rule would lead to an instability in that class of contracts which would be vicious.

I am unable to perceive that any duress, in the sense in which the law has heretofore regarded it, exists in this case either to the husband or through him to the wife.

It is true that the privilege which the law, in many states, has conferred upon the married woman to contract with and for the benefit of any one, including her husband, raises novel questions.

And where the contract is for the husband's benefit in those states where that is possible, the method by which the wife was induced to enter into the contract will probably afford frequent occasions for judicial supervision. But to break down the rules of the common law in treating of the validity of the contract of any person whom the legislature has seen fit to invest with an unfettered contracting ability, would lead to confusion and uncertainty.

The avoidance of contracts upon the ground of undue influence where, although there is no duress, one of the parties has taken advantage of the situation of the other, is a matter of purely equitable cognizance, and can receive no recognition in a court of law. 1 *Chitty on Con.* 273; 1 *Story's Eq. Jur.*, § 239.

I think there was no defence upon this part of the case.

The third ground of defence was, that at the time of the execution of the notes, it was represented to Mrs. Remington that the signing was a mere matter of form, and that she would not be held liable. There is no rule better settled than that evidence of contemporaneous parol declarations is inadmissible to vary the terms of a written contract.

In the enforcement of this rule, there is often a strong tendency to disregard its effect induced by a feeling of the inequity of holding a party to the strict performance of an agreement into which he has entered, upon an assurance that it would not be enforced according to its terms. This feeling has led courts sometimes to recognize the parol declaration, upon the ground that it amounted to an equitable estoppel. *Notes to Duchess of Kingston's case*, 3 *Smith's Lead. Cas.* 729. But the rule of evidence that when the contract is reduced to

Davis v. Township of Delaware.

writing, the writing is the only evidence of the contract, excludes any evidence of the parol declarations.

The rule is recognized as a wholesome doctrine by which men are enabled to place their agreements in a shape undisturbable by the uncertainty of oral testimony. The weight of authority is overwhelming in favor of holding, in the language of the American editors of the Duchess of Kingston's case, that "a person who is so ill-advised as to execute a written contract in reliance upon an assurance that it shall not be literally enforced, must submit to the loss if he is deceived, and cannot ask that a principle of great moment to the community shall be made to yield for the sake of relieving him from the consequences of his indiscretion." See cases cited in note, *supra*.

This rule prevails in equity as well as at law. *Woollam* v. *Hearn*, 2 *Lead. Cas. in Eq.* (3d. ed.) 679.

The rule is applied, in its entire rigor, to notes and bills. 2 *Parsons on Notes and Bills* 501; *Meyer* v. *Beardsley*, 1 *Vroom* 236.

The Circuit Court is advised that no legal defence to the notes in question was offered, and that the verdict should be set aside.